The next matter is Belmont v. MB Investment Partners. The next matter is Belmont v. MB Investment Partners. Mr. Madden, good morning. Your honor, I'm Paul Madden from the firm of Buchanan, Ingersoll & Rooney here in Philadelphia. I'd like to reserve five minutes for argument if you may. We've gotten warmed up on fiduciary duties here this morning. I didn't understand a word that transpired, Your Honor, but hopefully I'll do better here. The core of the investor's claim in this case is based on a common thread that we believe resonates both in Pennsylvania common law and the federal securities laws. And that thread is the duty to supervise securities professionals. The district court dismissed the investor's supervisory claims because of its belief that only the person at the center of a Ponzi scheme ought to have liability. The responsibilities placed on supervisors in state and federal law provide investors with more protection than that, we believe. There are two points on which we differ with the district court in its decision that Pennsylvania's supervisory liability does not afford investors a remedy. Does the defendant have to be an employer, and does the defendant's liability for negligent supervision turn on whether he or she knew that the employee tortfeasor was committing a fraud? We posited in our brief that the Pennsylvania Supreme Court has spoken on this issue definitively in the case of Hutchison versus Luddy, and found there that a negligent supervision claim includes supervisors. In Hutchison, that turned out to be the bishop. The determinant of liability in that case was not whether the defendant was the legal employer. Instead, the Supreme Court looked at the issue of who had the ability to control the employee, and also who had the power to terminate. But aren't the facts somewhat different, though? I mean, in Hutchison, the bishop was also the diocese. You're saying he was the alter ego. The court did not say he was the alter ego. But factually, that's what it was. The court spent time, Your Honor, looking at the situation of defining who it was in that case that had factual there was a factual determination, who had the ability to terminate. The bishop had that power. And that could be a board of directors in a corporation as well, who had the power to control. That would also be a supervisor as well as a corporation, for instance. Don't we have to do a bit of predicting in this case? You're asking us really to extend Hutchison to the facts of this case. Doesn't it cause us to predict what the Pennsylvania Supreme Court would find under these facts? The Pennsylvania Supreme Court, Your Honor, in looking at negligent supervision, has fuzzy parameters to the cause of action. It's what I'd like to think of as an amalgam. It's an amalgam. And Luddy v. Hutchison says this. It's an amalgam of Pennsylvania common law combined with the restatement of Agency 213 and the restatement second of Torts 317. And then they say, we're going to look to the law of other states as well. And they do all three. They harken back in their decision to a prior case, Dempsey v. Walsall Bureau, which is a Pennsylvania Supreme Court case 20-odd years before. In that case, the court looked at two different things. What it said was that negligent supervision is an outgrowth of negligence, and you've got to look for the duty of care. And if you have a duty of care, then they looked at two things, negligent hiring and negligent supervision. And they looked at, for hiring, what the employer knew in Dempsey at the time the employee was hired. And that was what Judge Schiller was looking at. But then in Dempsey, the court also said, we're going to look at supervision as well. And in that case, they found the supervision was adequate, but it was a separate inquiry and a separate endeavor. Robert, what's the basis for arguing that corporate directors have an obligation of supervision as opposed to – I mean, they have a general fiduciary obligation, but I understand, under kind of a care mark analysis, to the extent the law has been adopted. But what's the theory, the tort-based theory, for saying there's a duty to day-to-day be looking over an employee's shoulder on the part of a corporate director? Well, this case would present the unusual situation in which a director would have liability. And we base that on several factors, Your Honor. First, this case involves investment advisors, and the regulators place the duty of supervision starting at the top of the pyramid, because they want to build a culture of compliance. They say the first people liable are the directors. But, Mr. Mandel, unless you've got a legal basis for saying that Pennsylvania law imports federal regulatory regimes associated with the Investment Advisors Act, I'm starting where you're starting, which is with your negligent supervision, your state law tort claim. Focusing on that state law tort claim, the first question I've got is, who's got the duty? And you're saying directors have the duty. And I'm trying to find out from you what's the source in Pennsylvania law for your assertion that the duty to supervise employees rests with a board of directors? I don't think it's been addressed by Pennsylvania law, Your Honor. But Your Honor deviated for a second and said, does Pennsylvania import those standards of regulators and acts? And we have addressed that. Pennsylvania follows the Restatement Second of Torts 286, which permits the use of acts and regulations to serve as the standard of conduct in negligence actions. And even without resort to the restatement, courts applying Pennsylvania law and elsewhere look to such sources for the applicable standard of care. And I think we cited cases to that effect in our brief. The question I think the Pennsylvania court puts to us is, who has the duty? And in this case, the duty is one of reasonableness. Who has the responsibility? And the duty follows the responsibility. The case Your Honor pointed out, Caremark, is like the other cases that you see in other jurisdictions where they talk about the limits on the responsibilities of directors. Those are large corporations. I think someone cited the Getty case. There's a scale consideration. In smaller corporations, life can be different. But this case involves private equity. And that, I think, is the distinction here, Your Honor. Because in private equity, what the fund does...  with the nature of the enterprise? It depends on how the responsibility is allocated within the organization. How would we frame it? Let's assume for the sake of discussion, Mr. Mann, we were inclined to agree with you. What would the opinion look like? What direction would we give to corporate directors if we were to find liability here? How would we say this is a specific duty and it arises specific to this circumstance? How would you cabin what you call it? I think it's still back to Hutchison v. Luddy. If Your Honor looks at Hutchison v. Luddy, it's who had the authority to terminate and who had the control over the employee. In this case, this was a private equity investment. And in that situation, the fund stuck four directors on the board, for instance. And those four directors had the sole ability to terminate Mr. Bloom. Private equity firms are interested in maintaining control over the investment they make. And in this case, that investment was in a company whose employees they wanted to control. So how did they give that control? In an operating agreement that specifies specific things that couldn't be done without the director's authority and approval. And one of those was the ability to terminate people like Mr. Bloom. So he became very directly the supervisor under the test of Hutchison v. Luddy. All right. If you would speak to the question of whether these people were actually in some fashion negligent in the duties, say, they had. Because doesn't the need to supervise arise only when you've got some sort of a notice of the dangerous propensities of the employee or whether you knew or should know that there's a problem? Well, can I answer that? I think the other way to state that, and I'd add on to that, where is the reasonable foreseeability that if they had supervised, they would have discovered that this was a Ponzi scheme? Well, that's Heller v. Pat Wildholme. I didn't want to divert you from that, but I sort of wanted to add that whole concept on. So the question is, if there was no supervision at all, there would have been constructive notice. And that's position A we take. B is we say they were flooded with information. This is a case in which information was all around. Judge Sheller said it's speculation to ask the jury to determine what they would have known if they had actually done supervision. That's exactly what Pat Wildholme's and other cases require. And in this case, what they would have found is, take a look at what was, this was a fraud committed out in the open, Your Honor. You had a situation in which there were emails. Mr. Bloom chose to use the monitored email account. There was written correspondence. He used the secretary of the CEO of the company to send out his letters. Well, that's a statement that they should have known he was doing some North Hills work on company time, but how is that a statement that there's fraud out in the open? What's the assertion that these folks should have recognized? Oh my goodness, this man is operating a Ponzi scheme. Well, let me give you two examples because it's a voluminous record and I think two examples may help. Example one is Mr. Machinist, according to a lot of the evidence, sat in on meetings in which Mr. Bloom was pitching North Hills to customers as an MB fund. He knew that was wrong, and to the extent that happened, he knew wrongdoing was going on and he said nothing. Well, no, just pitching that to MB customers... He knew it wasn't an MB fund and it was being represented to be an MB fund. It was not an MB authorized fund and it also, Your Honor, was not an authorized fund of the company at all. You'll recall the testimony in the case that in the situation, if he was running a fund that hadn't been approved, he should have been fired in a heartbeat because that violated all sorts of SEC rules. Sure, but I guess I'm wondering about your premise there. You're saying he knew that it was being pitched as an MB fund. What's the factual underpinning for that? And remember, we're talking at the summary judgment stage here. The people he pitched it to and the people that heard it. There's deposition testimony. It was pitched as an MB fund. There is, Your Honor. It's in the brief. It was pitched as you can have access to the... It was pitched both ways and you'll see different people testify different ways on that. But there's a second example I want to give and that is in the documents that were on the server, there was a document that came up with one of the triggers. On the search, there was a trigger system where documents popped up and the compliance officer should have looked at them. One of those documents was the general ledger of the North Hills Fund. It showed massive amounts of money going to Mr. Bloom. I think someone said $9 million. Someone said $14 million. But MB wrote to the SEC saying this shows the problem and this was after the fact. It showed the fraud. It was the actual monies coming in and then being paid out directly to Mr. Bloom for his personal use. Can I ask my colleagues a factual question which I was not able to understand from what was in front of us? What was the, if you know, what was the character of each of these asset management accounts? Who actually had control and discretion with respect to the way the funds were invested? Do you know? Well, control. The way an investment advisor works is they make recommendations and the customer agrees with the recommendations or disagrees. We received an asset allocation. You'll see it's in the appendix. It's a circle and one of the parts of the circle, it's a pie chart, says credit arbitrage and that was the North Hills piece of the recommendation that was given, for instance, to Mr. Belmont. Mr. Belmont agreed to that asset allocation. The money then goes over to a brokerage firm and the brokerage firm does the actual investing. Altman played a role in all of this. He was the portfolio manager. And he was pitching. He was part of the sales process as well. That's correct, Your Honor. And what were his representations to Bloom? The representations he made were parroting the same things Bloom said. He said his representation as to MV was if you come to MV, you can get this investment at MV. It's available through us, through no one else. He also said it's got consistent returns that were remarkable in the state of the economy as it existed at that time. And we believe he should have known, based on what he was representing, that he had, A, that Bloom was in a conflict position, so he should have asked someone, how can Bloom be selling this as a fund if he's the manager of the fund? And he didn't do that. Whose fiduciary duty law applies here? You've made a fiduciary duty claim. What's the jurisdiction? To the extent there's a common law claim, and I guess I should ask that, are you making a common law breach fiduciary duty claim here? I think we all briefed it as though it was Pennsylvania, and there really was no battle over choice of law. But I think it's a question of whether there's a true conflict. New York law would be protective of New York citizens, and Pennsylvania law would be protective of Pennsylvania citizens. There are no New York investors, so I don't think there's an actual conflict here, Your Honor. Thank you, Your Honor. Thank you, Mr. Madden. Mr. Ansell, are you going first here? I am, thank you. Good. Good morning. Good morning, Your Honors. May it please the Court, Josh Ansell from Weill Goschel and Manjis on behalf of the Center Appellees. And just to reorient, because we've talked about a whole host of different groups of defendants, the Center Appellees, and we've referred to them a little bit already today, were the outside directors of MB, an investor in the case of Center MB Holdings, and in the case of Center Partners Management LLC, which is the private equity firm, an advisor to indirect non-party investors who are investors in the funds that Center Partners Management advises. And there are two claims against my clients in this case, negligent supervision, which we've talked about a decent amount, against the individual defendants, the outside directors, and then a claim that we didn't hear anything about at all today yet, which is control person liability under Section 20A of the Securities Exchange Act of 1934 against all of the Center Appellees. We've allocated our time 5-5-5, so I have no choice but to be brief, but I think the issues here are fairly simple. In short, what appellants are trying to do is seeking an unprecedented, and I would argue and I would submit, an unsupportable extension of the law, both with respect to negligent supervision and with respect to control person liability under Section 20A. We say this in our brief, but I think it begs repeating. There is no case that extends liability, either under negligent supervision or under Section 20A of the 34 Act, in similar circumstances and with respect to similarly situated defendants, as this case is trying to do. Now let me dig into that a little bit, because I think I can put some flesh on the bone to make these points clear. First, negligent supervision. There are two aspects that we've talked about briefly today. One, whether the claim under Pennsylvania common law can extend to a universe of defendants beyond the entity itself or the employer itself, and two, reasonable foreseeability. Now this court in Petruska v. Gannon University stated that negligent supervision is a claim against an employer. All of the cases talk about this claim being a claim against an employer, not against supervisors, not against others. Mr. Madden talked about Hutchison, and we've obviously had a big fight over Hutchison in the briefing as well and in the court below. But Hutchison doesn't address this issue at all. As Your Honor, Judge Fischer noted before, the bishop in Hutchison is essentially the alter ego of the diocese. There's no distinguishing between the two. They were a portion liability in the court below together, one block of liability. And there's no analysis by the Pennsylvania Supreme Court at all as to whether liability can extend beyond just the employer itself. There's no statement in Hutchison that the court was approaching, is this an alter ego circumstance? That's correct. So as it stands, does that case indicate that the liability can reach beyond the employer itself? Well, if this court was to read that case, and it's unclear to me from the decision, if you were to read this case as saying the bishop is someone other than the employer, then the answer to that would be yes. It's not clear from the opinion itself. I would submit that Hutchison is really a case of unforeseeability, not about the proper scope or the universe of defendants that could be liable for a claim under negligent supervision. There are actually only two cases that I'm aware of that have addressed this claim under Pennsylvania law and have actually analyzed this issue. It's the FBP case in the Pennsylvania Superior Court, and it's the Quandary Solutions case in the Eastern District of Pennsylvania. Both of those cases identify the key element of negligent supervision being the employer-employee relationship and refusing to extend liability beyond that. In the case of FBP to a mental health facility, in the case of Quandary Solutions to a parent corporation. So there's no precedential support for what plaintiffs are trying to do. And even if you were to give some credence to the cases that they cited, because there are a few cases with no analysis whatsoever that have extended the claim beyond just employer to an officer, there's no precedential support to extend it to an outside director. There's not a single case that does that. But, Your Honors, you need not even reach this issue, because reasonable foreseeability ends the case right there, ends the claim right there. It has been bedrock law of Pennsylvania since the Dempsey case in 1968 that reasonable foreseeability requires a known propensity for wrongdoing. That was 1968 Dempsey. That was Hutchison v. Luddy in 2000. Heller v. Powell Holmes, which came in between, is a decision of an intermediate court in Pennsylvania. It's the Pennsylvania Superior Court. But here you have all these representations by Bloom and others who were part of the company about North Hills, recommendations for existing clients to invest in North Hills. And as Mr. Madden said, if somebody had looked on the server for documents that certainly should have raised people's attention, that there may have been something wrong here with the amount of money that had been going to Bloom out of North Hills. So how can you say there's absolutely no foreseeability when the test is reasonable foreseeability? Well, again, Your Honor, I believe the test under Pennsylvania law, again, going back to the late 60s and Dempsey, is one of known propensity, which requires that you actually know, you've known that there were prior bad acts of the same exact character that's being alleged in the case. There's none of that here. To the extent anyone was looking at documents on MB server, it clearly wasn't the outside directors. There's no authority to suggest that an outside director has a duty to come in. What about Heller? Heller's a case against an employer, an entity only, first of all. And second of all, it applies a constructive notice. And interestingly, Heller cites the Dempsey and identifies – Well, that helps your directors, but that doesn't help MB. Well, I'll let them speak for themselves. But I'll tell you that appellants here never asserted this claim against MB, ironically, given that this is actually a claim against an employer. They never asserted the claim against MB. But Heller versus Patwell Holmes, again, intermediate court, it cited the Dempsey and relies on Dempsey in stating that the standard is known propensity, but then deviates entirely to come up with a constructive notice standard that no other court has ever adopted. Pennsylvania Supreme Court clearly didn't adopt it in Hutchison. And like I said earlier, Hutchison is a case about reasonable foreseeability, not about the scope of defendants that are liable for unclaimed negligent supervision. I see that my time is up. No, we'll give you – let you finish up. Thank you. I'll be brief. I want to just talk briefly – and just to close the loop on reasonable foreseeability, it's acknowledged here by appellants that the defendants in the case, the appellees on appeal, knew nothing of the fraud. They talk about things that people could have done, could have looked at, but they acknowledge that no one knew anything about the fraud. And I'll tell you that there was more here that they could have found. There was a compliance program in place. They quibble with it, but there was a compliance program in place. My clients, the center appellees, conducted a background check, which showed that Mr. Bloom had no background, no fraudulent background. So there's a lot there. So the bottom line is that there's no foreseeability. Just very briefly on control person liability, there are two bases to affirm the Section 28 decision by Judge Schiller, either no culpable participation, which is the ground reached by the district court, or no control, which is an argument that was briefed below but not reached by the district court because it granted summary judgment on the culpable participation point. Now, it's been the law in the Third Circuit for almost 40 years, dating back to the Roche brothers' case, that inaction alone cannot be a basis for liability under Section 28. It can only be a basis for liability under Section 28 where it's deliberate or intentional. And I don't think there's any argument that's even been made in this case, whether in the district court or in the Third Circuit, that there was anything done here by my clients, the center appellees, that was either deliberate or intentional. They argue for a recklessness standard, and they talk about a case called PopTech out of the District of Connecticut, but even that case, it's a pleading case, mind you, not a summary judgment decision, but as a pleading matter, it says that recklessness in the Section 28 context still requires knowledge. It says, and I'm quoting from that decision, knowledge is the first step in proving active participation. There's no knowledge here. Are you agreeing or not agreeing with the assertion that they've made that recklessness, a showing of recklessness would be enough for a 28 liability? For sure in the Second Circuit, because they cite PopTech and there are some other decisions. Unclear in this court. There are some decisions that suggest that it could be, including the DVI case in the Eastern District of Pennsylvania and some others. But to the extent that a recklessness, like I said, if recklessness even applies, it still has a knowledge component. It's not measured. So recklessness plus? Yes, under the cases. Or if you were looking at it as just a general recklessness standard, under ReliASTAR and those decisions. There's nothing here that suggests there was an extreme departure from the standards of care. There just wasn't. So they can't make out that claim for lack of culpable participation. Just to conclude very briefly, no one disputes in this case that the appellants lost a great deal of money. My clients, the Center Appellees and the investors that they advise, lost significantly more. They lost a ton of money as well. It's an incredibly unfortunate situation. It left a bad taste in my clients' mouths, as I'm sure it did for the appellants. But as the district court correctly observed, appellants' claim is with Mr. Bloom and Mr. Bloom alone. This court in Roche was very clear that Congress did not intend anyone to be an insurer against the fraudulent activities of another. And that's essentially what appellants are trying to do here. We ask that the district court opinion be affirmed in all respects. Thank you, Your Honor. Any other questions? Good. Thank you very much, Mr. Amsel. Mr. Kuchin? Am I pronouncing that correctly? Kuchin? Kuchin. Thank you. Good morning, Your Honors. May it please the Court, my name is Edward Kuchin, and I represent the MB Investment Partners, Robert Machinist, Benjamin Groskup, Thomas Farr, Christine Munn, who are all officers and directors of MB, and Robert Bernard. This lawsuit represents appellants' attempt to recoup losses suffered at the hands of Mark Bloom by imposing unprecedented liability on the MB appellees for a fraud that appellants concede the MB appellees knew nothing about. The record indisputably establishes that the fraud was committed through a totally separate and distinct entity fund solely owned and operated by Bloom for many years prior to his employment by MB and that had no affiliation with and provided no benefit to MB appellees. Mr. Kuchin, let's talk for a minute about incubation, okay? Under Pennsylvania law, there's a statement that I want you to react to by the Pennsylvania State Supreme Court. They say that the underlying purpose of imputation, ellipse, is fair risk allocation including the affordance of appropriate protection to those who transact business with corporations. If that's the principle, why shouldn't Mr. Bloom's fraud be imputed to MB? Because a number of things, Your Honor. First of all, foreseeability. Second of all, there was no awareness whatsoever and they have not shown, there's not a scintilla of evidence that they have shown that in fact any of the MB appellees were aware of the perpetration. I'm not talking about the MB appellees generally. Okay. I'm talking about MB, the entity. Do you represent the entity? Yes, I do, sir. Okay. So as to the entity, why shouldn't the wrongdoing of an officer, and director, be imputed to the organization? If I've understood what the Pennsylvania Supreme Court seems to be saying, it's something along the lines of the purpose of imputation is to see that the risk is appropriately allocated and it doesn't fall on innocent third parties who deal with corporate entities. So we're going to say that unless there's an adverse interest where there's no benefit to the corporation, we're going to impute. Is that the law? But I think under the adverse agent exception, there was no benefit whatsoever, sir, in this particular situation. Well, it turns out in the end there was no benefit for sure, but that's not the position or posture that the law asks us to take, is it? I mean, aren't we supposed to look at this from the perspective of the third parties dealing with Mr. Bloom? I mean, there's some element of apparent authority that comes into play here, isn't there? Well, Your Honor, I understand exactly what you're saying, but I must respectfully disagree because in this particular situation, the appellants were on notice, in fact, that it was a totally separate, distinct entity. As the facts have shown, and they're undisputed, Mr. Belmont, who had invested $3.5 of the $4.4 million in this entity, received a prospectus. He received monthly statements, as did Mr. Kelley. All of these showed that it was a totally separate, distinct entity. Well, let's go after that in a minute. Stick with me on the point I've got you on, if you would, and assume for the sake of discussion that the district court was required to make, if that's true, the assertions by at least some of the appellants, that to them it was a selling point that Mr. Bloom ran North Hills, that they were happy to come to M.D. because coming to M.D. gave them access to North Hills, which is what some of them argue was significant to them. If that's true, and the selling of North Hills by Mr. Bloom was part of the selling of M.D., why isn't that a benefit to the corporation in the sense that the imputation law considers it? Well, I guess, Your Honor, I would go back to Roche's and that progeny, and where it talks about corporate officers, the acts of a corporate officer are typically imputed to the corporation, and the fraud is imputed to the corporation only when the officer commits the fraud in the course of his employment and for the benefit of this corporation. I think it's clear here, sir, that, number one, it was clearly not within the course of his employment. In fact, it had nothing to do with nobody was in any way aware of the fact that North Hills was being operated or that it was a Ponzi scheme. And second of all, it clearly was not for the benefit of the corporation because, in fact, it brought the demise of the corporation. Is that the perspective that you're supposed to take after the fact that it didn't work out, then you say it wasn't for the benefit, or do you look at it for imputation purposes in advance when it's happening, at the time it's happening? Well, I think you have to look at, sir, the particular facts. And in this particular situation, and I take great, again, the alleged facts that were brought forth by my brother here today, we sincerely believe, and you'll see in our brief, they're not facts, they haven't been proven at all. But, in fact, there was no knowledge whatsoever, and the appellants have not shown that anybody at MB was aware of the existence of North Hills, that they had a compliance program in effect. Nobody was aware of the existence of North Hills? The only one that was aware that it existed was Robert Machinist, and he thought it was a family fund, number one, and, number two, that it had Mr. Altman knew, too. Well, I don't know what Mr. Altman knew because he had no authority. Well, that's what the plaintiffs allege. I mean, the record shows that secretaries, assistants, a lot of people in the company helped Mr. Bloom with North Hills investments. Your Honor, in all difference to my brother, they take great liberties. What, in fact, they have shown is over a period of three and a half years, there were a few faxes sent. This clear case law that shows that you can't impute anything that an administrator might have done by a fax or something like that to the MB appellees. There was no knowledge there. You can't impute that. What about Mr. Wallace? He thought he was a client of MB. No, Mr. Wallace had no basis. He had no relationship whatsoever with MB. He only met Mark Bloom, and he allegedly says that he met Mr. Machinist. But then again, whoever testified, and I can show you, it's right in our papers, they said that they don't know. Mr. Machinist never mentioned North Hills, and they don't know if he heard what they allege Mr. Bloom said. But as far as Mr. Wallace, he never met with anybody at MB's office, never met with anybody other than Machinist allegedly in that one meeting at a hotel. Number three, he never invested any money with MB. He never paid any funds to MB. So how can he raise a fiduciary obligation? There was no relationship whatsoever. They didn't even know he existed. No, Machinist, I mean, you say except Machinist. No, no, Machinist met him allegedly. And again, Mr. Machinist says he didn't. And again, but we don't believe that's a genuine issue of material fact. But at one particular meeting, and that's what they say, and we refute that in our brief, but they also admit that Mr. Machinist never mentioned the word North Hills. He never, he was not a Kupferberg participant. He didn't benefit. He himself lost a lot of money when MB went down. Even if he's hurt by it, if you take Mr. Wallace's testimony as true, even if you're correct that Mr. Machinist didn't start talking about North Hills, if he's sitting next to Mr. Bloom while Mr. Bloom is pitching North Hills and implying in some fashion that it's associated with MB, are you saying that's not enough to create a level of knowledge within the organization, with the CEO sitting there? Sir, if I may, Your Honor, that is not the state of the evidence. They said he was in a room, number one. Number two, there's no evidence that he was in the room when Mr. Bloom allegedly made any comments. There's no evidence that, in fact, he was on a cell phone. All they said, they said he was in the room, that he never said anything and he never talked about North Hills and they never talked to Mr. Machinist about North Hills. And, in fact, Your Honor, if in fact they felt that MB was responsible, as they allege, and that the businesses were integrated, why is it after Mr. Bloom was arrested for the four or five weeks that MB was in existence, not one appellant ever contacted anybody, including Mr. Machinist, at MB to inquire where their investments were. You know why, Your Honor? Because of the fact that they knew there was nothing. All they're trying to do is they can't recoup their losses from Bloom. They're trying to go after a deep pocket. And this court, the Honorable Judge Shiller, did an excellent job of showing, in fact, that they had no claims. And, again, as you know, there are five counts against my claims, two against the individuals and three against MB. And to your point, Judge Jordan, you asked the point about MB was not named, as my brother, Mr. Amsell, said. They were not named in either the 20A or the negligent supervision claim. It was only the individuals. Your Honor, I see that my time has run, but can I just say a couple of things? We'll give you one minute. Thank you, sir. In closing, I cannot say it better than the Pennsylvania Superior Court stated in Cover v. Cushing Capital, a case that was very similar factually to the case here at Bar. The Cover Court stated, at no time did appellants have direct communication with Cushing Capital. Here, nobody had direct communication with MB. Indeed, appellants never made inquiry of Cushing Capital regarding their investments. Same here. All inquiries were made to and answered by the perpetrator. He and he alone was engaged in a scheme to defraud. His scheme was outside the scope of his employment and was antagonistic to his principle. The evidence showed, and the trial court found, is fact that Cushing Capital had no knowledge of the perpetrator's personal machinations, which were calculated to line his pockets at the expense of his customers. Under these circumstances, Cushing Capital was not obligated to answer vicariously for losses suffered as a result of the perpetrator's peculations. For all of these reasons, your honors, I believe this court should affirm the district court's ruling in its entirety. Thank you very much. Thank you very much. Mr. Galante? Good morning. Good morning. May it please the court, Alan Galante for the appellee Ronald Altman. Your honors, the district court's well-reasoned decision dismissing the complaint against Ronald Altman under 12B6 should be affirmed. The complaint fails to allege any facts to even suggest that Altman had any knowledge of the fraud, which was committed solely by Bloom through North Hills, an entity in which Altman had no interest, no involvement, and no control. But he certainly had knowledge of. He certainly had knowledge of North Hills. This was on a motion to dismiss. They say he was at a meeting where North Hills was discussed. So that's got to be taken as true. Okay? But it does not mean that they are off the hook for their pleading requirements of both Sienta, under the federal securities laws, and detailing what Mr. Altman's misrepresentation was with respect to any investment in North Hills. That is completely failing. And to hold Mr. Altman liable under this court's various decisions in Weiner Trust, in a numerous line of cases at Vanta, Alpharma from 2004, Suprema Specialties in 2006, would go completely in the face of this court's precedent in this regard. It's also important to note that there is no allegation that Altman benefited in any way from this fraud, or that he had any control over or responsibility for Bloom, who was actually his superior at MB. Are those things legally significant? What are the specific claims against Mr. Altman? They say that he is responsible under 10b-5 for securities fraud, when there are no allegations that he had the requisite Sienta, that he had any knowledge, or that he misrepresented anything to these plaintiffs. The assertion that he didn't benefit, that's not relevant. It goes to plausibility. I mean, a complaint under the Supreme Court standard has to be plausible. It also goes to the determination of whether there's any factual allegations that there was Sienta in this case. And there is none. And as to recklessness, this court has been absolutely clear that recklessness is not negligence. It's not even inexcusable negligence. It's something far more from that. It's an extreme departure from ordinary care. And there are no facts alleged here that would even begin to suggest that Altman had any extreme departure from ordinary care. In fact, when you look at the complaint, there are no allegations that he even met with or made any representations to four of the five appellants in the case, or that there was any connection between anything he allegedly said, which is limited to one meeting, early on, with any of their investments in North Hills. Even if it's true that he, at a meeting in 2006, said, invest in North Hills, which if this had gone on we would have disputed, how does that relate to an investment in 2007 or 2008 with somebody who wasn't even at the meeting? So there's not only no Sienta. There's not only no allegations of misrepresentation, but there's no causal connection with anything he allegedly said or did and the loss. The loss was caused by Bloom's embezzlement and fraud. And Mr. Altman is not alleged to have any participation or knowledge of it. Their claim is that he was somehow reckless because he should have known. He should have discovered. But there's no allegation as to where that duty comes from. What he was supposed to do to discover it. I mean, this was a secret fraud that was committed by a single individual. It was not discovered for years. And the fact that they're trying to put this burden on Altman, a subordinate to Bloom at MB, makes no sense and is simply not plausible. The notion that Altman would jeopardize his career to somehow protect Bloom's embezzlement fraud scheme when he had no part in it and did not benefit from it in any way is simply implausible. And therefore, on that ground alone. Well, I guess the argument from the other side, or at least I take the inference from their briefing to be that Mr. Altman, like Mr. Machinist and others at MB, were perfectly prepared to turn their head as long as Mr. Bloom was bringing in money. So even if they didn't get money from North Hills itself, if North Hills was a selling point to bring people to MB from whom they would get money, that was a benefit to them and they were happy to ride that. What's implausible about that scenario? Several things. Number one, Altman had no duty or position where he could supervise or control what Bloom was doing. Two, he was not... Does a 10B5 liability depend on supervised reauthority? No, but it depends on a plausible allegation that he had scienther. So speak to what I understand, and I don't want to put words in their mouth, but what I understand sort of the gist of their argument to be is Altman was happy to have Bloom talk up North Hills and to in fact himself talk up North Hills because this was a way to encourage people to come to MB and bring their monies, the supervision and investment of which would benefit Mr. Altman. And you're saying that's implausible, and I'm trying to find out what's implausible about that theory of the facts. There are several things that make no sense about that. Not only that it's implausible, but it is not alleged in the complaint, number one. Number two, there's no specification of what Altman misrepresented to these people. Number three, there's no indication that he had any knowledge of what was going on and therefore could not have had the necessary scienther. Number four, there's no allegation that he had any discussion or involvement with four of the five appellants at all with regard to any investment in North Hills. So how he was acting with this purported benefit is implausible. I see my time is up. Thank you very much. Any other questions? Thank you, Mr. Galante. Mr. Madden. Let me see if I can be helpful on three or four points, Your Honor, and I think I can sift through what's just been done and limit myself to that. Hutchison v. Luddy. I think there's more to it than any of us have suggested. If we look at what the court drew on in reaching its decision as to whether it intended for supervisors to be liable, the court pointed out it was not only drawing from the restatements in Pennsylvania common law, but from the law of other jurisdictions. And the cases it pointed to in the other jurisdictions were interesting. One was the Funkhauser case in Washington. The person liable in that case is a supervisor, the head of a board of deacons. That's not an alter ego of an archdiocese, Your Honor. A regional Boy Scout council, closer but not an employer. School officials, as well as the school district. That one's not an alter ego. It's supervisors they're looking at in those cases, Your Honors. Who ends up being liable in those cases? Who's the defendant in those cases? These are defendants in each of these cases, Your Honor. The defendants are the employer and the supervisor in each of the three cases. Actually, there's four. There are two scouting cases. One's New Hampshire. And you say they're defendants. Are they defendants on the negligent supervision claims? They are, Your Honor. And so you're saying, because, of course, the argument that's been made from the other side is there's not a case out there, other than Hutchinson, which can be explained away, where negligent supervisor liability has been directed at individuals. It's always directed at the employers, and you're saying that's just flat wrong. I'm saying the Supreme Court pointed to cases that show it's flat wrong. The second issue is Dempsey. Mr. Anselm said, and I think erroneously, that Dempsey required foreseeability. There were two prongs to Dempsey, and you've got to read to the end of the case to see that there are two prongs. One was they were looking at the negligent hiring. And for that part, they expectedly and surely said, you've got to know that he was doing something wrong for us to hold you responsible for negligent hiring. But when they started looking at this negligent supervision, they did not talk about foreseeability in that context. They merely talked about whether the hour every now and then that the employer was spending supervising was sufficient. And they found in that case, for the purposes of that case, it was. Wouldn't it have to include a component of foreseeability, Mr. Mann? How could you make an assertion that somebody was negligent, that is that they fell below a standard of expected care, without having some component of foreseeability be part of it? Well, there was supervision in this case. In our case, we're saying there was practically no supervision.  And in this case, the facts seem to be there was a compliance officer. There was a set of compliance requirements in the organization. You can say, well, the system broke down, obviously. But is it really the case that there was no supervision? Is that justified on this record? I think the expert said virtually no supervision. Certainly not from the top. The directors never met with the compliance officer. The subject of compliance never once came up in the minutes of any director's meetings. It was not a subject of interest to the people that had the ability to control Bloom. And I also want to talk, I said three or four, I'll limit it to three. My position is that it would be reasonably foreseeable that this almost bogus system of supervision might create problems like the one that occurred here. That's exactly correct, Your Honor. I also want to talk about controlling person for just a moment. We talked in our brief about Roche v. Rhodes as well. This court recognized in that case a subsidiary concept that no one has talked about yet, which is situations in which there is a strict requirement of supervision. And in that case, they were talking about broker-dealers. This court cited favorably to SEC v. First Securities in the Seventh Circuit there, which said that the failure of controlling persons to maintain and diligently enforce a proper system of internal supervision constitutes participation in the misconduct. And a few years later in the Eastern District of Pennsylvania, Judge Lord gave the requirement the same meaning in Walsh v. Butcher and Sherrod. This aspect of culpable participation extends to more than just broker-dealers. Investment advisors, and we point this out in our brief, are subject to virtually identical supervisory requirements. And this court made clear in Sharpe v. Coopers and Libran that there are more situations than just broker-dealers for which a duty of careful supervision exists, and that it is especially apt to require that where communications are being made to investors. Thank you, Your Honors. Good. Thank you very much, Mr. Madden. Any questions? No. Case was very well argued. We will take the matter under advisement.